# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MAHMOUD SAFFARI,

       Plaintiff,

v.                                    **MEMORANDUM OF LAW & ORDER**
                               Civil File No. 13-30 (MJD/LIB)

ST. CLOUD STATE UNIVERSITY
and PRESIDENT EARL H. POTTER III,

       Defendants.

Judith K. Schermer, Judith K. Schermer PLLC, Counsel for Plaintiff.

Kathryn Fodness and Kristyn M. Anderson, Minnesota Attorney General's Office, Counsel for Defendants.

## I.   INTRODUCTION

This matter is before the Court on Defendants St. Cloud State University and President Earl H. Potter III's Motion for Summary Judgment. [Docket No. 19] The Court heard oral argument on April 11, 2014. Finding no genuine dispute of material fact, the Court grants Defendants' motion.

1

## II.   BACKGROUND

Plaintiff Mahmoud Saffari is suing his former employer, St. Cloud State

University ("SCSU"), and its President, Earl H. Potter III.

### A. Factual Background

#### i.  Plaintiff's First Four Years at SCSU

Plaintiff is a 53-year-old Muslim man of Iranian descent.  (Saffari Aff. ¶ 2.)

In 2003, Plaintiff began working at SCSU as Associate Vice President for

Enrollment Management under President Roy Saigo.  (Anderson Aff., Ex. 1,

Saffari Dep., Ex. 4.)  This was an important position in SCSU's administration,

and Plaintiff served at the pleasure of SCSU's President as a member of his

leadership team.  (Potter Aff., Docket No. 22, ¶¶ 3-5.)  This position was one of

at-will employment.  (Minnesota State Colleges and Universities Personnel Plan

for Administrators, http://www.hr.mnscu.edu/Cabinet_Executive_Se/documents/

AdminPlanNonLeg.pdf, at 9, § 1.03, subd. 3(a) ("Administrators serve at the

pleasure of the Chancellor / president and no provision of this Plan shall be

construed to alter the at-will nature of an administrator's employment.").)

Plaintiff's job duties were as follows:

2

> [To] design, develop and implement a comprehensive enrollment management plan to achieve the desired size and profile of the student body. . . . The Associate Vice President works not only with faculty and staff throughout campus and across divisions but also with the external constituents . . . to develop short and long-term enrollment management plans, establish objectives and develop strategies in support of those plans, facilitate implementation of enrollment management strategies, and monitor progress toward enrollment management goals.

(Potter Aff., Ex. A, at SAFFARI 2740.)  Plaintiff's position was an important one with substantial responsibility; he managed a two million dollar budget and supervised 30 employees and 24 student workers.  (Potter Aff. ¶¶ 3-4.)

During his initial years at SCSU, Plaintiff was supervised by SCSU's Provost, Michael Spitzer.  (Potter Aff. ¶ 2.)  Spitzer and Plaintiff developed a negative working relationship during these years.  (Id.)  Plaintiff claims that Spitzer removed many of Plaintiff's duties, refused to put Plaintiff's suggested items for discussion on the President's Council agenda, refused to hire a Dean of Admissions, refused to give Plaintiff a computer, and generally created obstacles for Plaintiff.  (Saffari Aff. ¶¶ 6-11.)  In 2005, Plaintiff filed a discrimination complaint against Spitzer.  (Saffari Aff. ¶ 12.)  SCSU lost the complaint documents Plaintiff submitted, and there was disagreement over how to conduct the investigation.  (Id.)

3

### ii.  Changes in Leadership at SCSU and Plaintiff's Subsequent Performance

On July 1, 2007, Potter became SCSU's new President.  (Potter Dep. 5.)

Potter asked Plaintiff to develop and implement a comprehensive enrollment

management plan.  (Potter Dep. 44-45, 48-49.)  Plaintiff was told that the plan

should contain detailed statistical analysis of enrollment trends.  (Id.)  In 2007,

Plaintiff presented Potter with a 96-page document, but because the plan lacked

the data analysis Potter requested, Potter rejected the document and told Plaintiff

to lead the Enrollment Management Committee ("E/M Committee") in

developing the requested data analysis.  (Potter Aff. ¶ 6; Potter Dep. 48-49;

Saffari Aff. ¶ 15, Ex. A.)  The E/M Committee, which met biweekly, was

comprised of 30 to 35 members from all areas of SCSU.  (Palmer Dep. 7, 9.)

However, for over two years, in spite of informing other administrators that the

enrollment management plan was in development, Plaintiff did not produce the

data analysis.  (Potter Dep. 21, 77-78; Malhotra Dep. 19-20.)

Plaintiff offers a different account of his interaction with Potter regarding

the enrollment management plan.  Plaintiff asserts that Potter accepted the plan

document and never commented on its contents.  Rather, Potter simply

instructed Plaintiff to come up with a new plan.  (Saffari Aff. ¶ 16.)

Meanwhile, Plaintiff's discrimination complaint against Spitzer was

investigated in 2008.  (Saffari Aff. ¶ 12.)  Plaintiff was told by the investigator

that the affirmative action officer at SCSU referred to Plaintiff as "that Arab guy

who's giving us a hard time."  (Saffari Dep. 80.)

### iii.  Conversation with Potter About Iranian Politics

At some point in 2008, in the midst of Plaintiff's problems with Spitzer,

Potter called Plaintiff to discuss his relationship with Spitzer.  (Saffari Dep. 24-

25.)  Potter asked Plaintiff if his relationship with Spitzer was sour because

Spitzer was Jewish and Plaintiff was Muslim.  (Id.)  Plaintiff alleges that Potter

also engaged in a conversation or conversations with Plaintiff about the politics

of Iran, attempting to get him to admit that the Shah was better than the current

political leadership.  (Saffari Dep. 77-78 (detailing one such conversation that

took place in 2007; the timing of any other similar conversations is unclear from

the record).)  Potter also asked Plaintiff's opinions about the Mullahs and the

established government of Iran.  (Id.)  These conversations made Plaintiff feel

very uncomfortable, and he felt that Potter did not approve of his political views. (Saffari Aff. ¶ 44; Saffari Dep. 78.)

### iv.  Potter Decides to Retain Plaintiff, and Malhotra Becomes Provost

In 2009, Spitzer recommended to Potter that the administration should be reorganized and Plaintiff's position should be eliminated.  (Potter Aff. ¶ 2.) Potter thought that Spitzer's impending retirement would give Plaintiff an opportunity to have a fresh start with a new supervisor, Provost Devinder Malhotra.  (Potter Dep. 41; Potter Aff. ¶ 2.)  Therefore, Potter decided to reject Spitzer's recommendation and retain Plaintiff.  (Id.)

Malhotra became Provost in July 2009.  (Malhotra Dep. 5.)  Spitzer, before leaving, told both Potter and Malhotra that he was dissatisfied with Plaintiff's performance.  (Potter Dep. 18.)  In addressing the enrollment management plan, Malhotra charged a subcommittee of the E/M Committee to develop a predictive model for enrollment management.  (Palmer Dep. 9.)  At times, Malhotra would tell Plaintiff that he and the members of the E/M Committee "were on the right track."  (Saffari Dep. 35.)  Plaintiff asserts that, during his two years reporting to Malhotra, he never received a performance evaluation.  (Saffari Aff. ¶ 26;

6

Malhotra Dep. 33.)  Plaintiff asserts that, in May 2011, Malhotra agreed with

Plaintiff in setting a goal date of November 2011 to present a completed

enrollment management plan.  (Saffari Aff. ¶ 29.)  Malhotra could not recall the

deadline imposed.  (Malhotra Dep. 19.)

### v.  SCSU's Budget Shortfall

SCSU is required to submit its enrollment projections and budget requests

to the Minnesota State Colleges and Universities System Office each April.

(Potter Aff. ¶ 7.)  The System Office relies on these forecasts and requests to

determine its income and expenditures.  (Id.)  By the spring of 2011, Plaintiff still

had not yet created the enrollment management plan based on data analysis that

Potter had repeatedly requested.  (Potter Aff. ¶ 8.)  Plaintiff had, instead, given

forecasts on enrollment based on anecdotal information, such as the number of

students who had enrolled the past fall, and Plaintiff assured Potter that the

projections were accurate.  (Potter Aff. ¶¶ 8-9; Potter Dep. 21-22.)

These projections predicted a decline in enrollment for the fall of 2011.

(Palmer Dep. 17, 21.)  Malhotra insisted that the forecasts were too conservative,

and he asked the E/M Committee to add 250 FYE (full-year equivalent, i.e., a unit

indicating full- or part-time undergraduate or graduate students) to the projected number of enrolled students, which Plaintiff claims made the projections inaccurate.  (Saffari Dep. 50-52; Saffari Aff. ¶ 28.)  Plaintiff claims that the E/M Committee disagreed with adding the 250 number, but had no choice but to accept Malhotra's instructions.  (Id.)  As a result, the prediction for students was "off by the additional 250 that he added."  (Id.)  Defendants assert, however, that SCSU relied on Plaintiff's forecasts in developing and submitting a budget for the 2011-2012 academic year.  (Potter Aff. ¶ 9.)

In August of 2011, SCSU learned that its actual enrollment for the fall semester had a significant shortfall: the differential between Plaintiff's projection of enrollment and actual enrollment was between 800 and 1000 students.  (Potter Aff. ¶ 10; Potter Dep. 126.)  Consequently, SCSU had to make a one million dollar emergency budget adjustment.  (Potter Aff. ¶ 10; Potter Dep. 24-25, 71.)  While Potter did not blame Plaintiff for the enrollment decline itself, he attributed SCSU's emergency budget situation to Plaintiff's failure to provide enrollment forecasts based on data analysis after Potter's repeated requests.  (Potter Aff. ¶ 11.)

### vi.  Plaintiff's Speech at the August 1, 2011 Leadership Retreat

On August 1, 2011, Plaintiff attended a leadership retreat for senior management.  (Saffari Dep. 38-42.)  At the retreat, Plaintiff asked about the method of choosing focus groups for a marketing presentation that was being given; Plaintiff asked whether subjects for the focus groups had been selected at random or handpicked.  (Saffari Dep. 39, 44-45.)  Plaintiff asserts that, at this point, Potter became angry with him; Potter glared at Plaintiff and, in an angry tone of voice, stated that they would move on to the next agenda item.  (Id. at 40.)

Plaintiff also asserts that, later in the retreat, Plaintiff made a comment regarding SCSU's reputation for being a party school.  (Saffari Dep. 40-42.)  Plaintiff stated that this reputation may have negatively affected enrollment, and he suggested ways to change the perception.  (Id.)   Plaintiff asserts that Potter became angry, stood up, cut Plaintiff off, and ended the discussion by announcing that it was time to take a recess.  (Saffari Aff. ¶ 37.)  Plaintiff felt that no one wanted to speak to him or associate with him because of Potter's display of anger towards him.  (Id.)  Potter later testified that there was no discussion about terminating Saffari before this retreat.  (Potter Dep. 68.)

9

Potter stated that he expected Plaintiff to publicly support policies that had been internally decided on and implemented by the school, as Plaintiff was a member of Potter's leadership team.  (Potter Aff. ¶ 12; Potter Dep. 131-33.) However, Potter thought that Plaintiff's speech placed blame for enrollment losses on others, and this reflected poorly on the University and its administrators.  (Potter Aff. ¶ 12; Potter Dep. 130-36.)

### vii.   Plaintiff Disallowed from Speaking to the Faculty Senate

In September 2011, Plaintiff was invited by the Faculty Senate to attend their meeting, report enrollment statistics to them, and address their concerns about enrollment.  (Saffari Aff. ¶ 31.)  Plaintiff told Malhotra that he had been invited to make the presentation; he showed Malhotra the invitation to check and see if it was permissible for him to attend, as speaking to the Faculty Senate was not within Plaintiff's usual job duties.  (Saffari Aff. ¶ 31; Malhotra Dep. 61-62.) Malhotra told Plaintiff that Malhotra would go to the meeting instead because it was Malhotra's responsibility to make such presentations, not Plaintiff's.  (Id.) Malhotra stated that, "[M]y decision was based on the fact that there should be one voice speaking for the administration when we were invited to the Faculty

Senate.  And relationships with the Faculty Senate are my direct responsibility, so I was acting out of that."  (Id. at 62.)

### viii.  Disbandment of the E/M Committee

After the budget shortfall, Malhotra and Potter made the decision to reorganize the administration to improve enrollment management.  (Potter Dep. 75; Malhotra Dep. 48.)  They decided to disband the E/M Committee because it had not developed an enrollment management plan using data analysis.  (Potter Aff. ¶ 13; Potter Dep. 75-76; Malhotra Dep. 19-20.)

On August 19, 2011, Malhotra notified the E/M Committee that the committee was being suspended, explaining that "we need to provide you better tools, in the form of data analytics and a strategic enrollment management approach(es), in order for the committee to do its work successfully."  (Anderson Aff., Ex. 1, Saffari Dep., Ex. 41, at Saffari 0001.)  A new team was created, and Malhotra took responsibility to oversee an "Enrollment Executive Council . . . to develop a strategic enrollment framework that will be used to develop the overall enrollment management plan."  Id.

### ix.  The Strategic Planning Committee Meeting with Foss

Plaintiff contends that he spoke at a Strategic Planning and Effectiveness Committee meeting on September 1, 2011.  (Saffari Aff. 38.)  During this meeting, Plaintiff attributed the enrollment decline to management decisions to reorganize and cut student majors for the 2011-2012 academic year.  (Id.)  Upon making this statement, Plaintiff alleges that he was silenced by Lisa Foss, Associate Vice President and Associate Provost for Strategy Planning and Effectiveness.  (Id.; Foss Dep. 5.)

Plaintiff also asserts that he accused Foss of racial discrimination at this meeting, citing the fact that she cut off people of color when they attempted to speak.  (Saffari Aff. ¶ 38.)  When Plaintiff attempted to raise this issue, he was prevented from doing so by Foss.  (Id.)

### x.  Plaintiff's Termination

In early September, Potter, Malhotra, Foss, and Special Assistant to the President, Judith Siminoe, came to the decision to terminate Plaintiff.  (Schermer Aff., Ex. 6, Potter's Answers to Interrogs., No. 2; Siminoe Dep. 5, 7.)  In discussing reasons for Plaintiff's termination, Potter told the group that he was

concerned about Plaintiff's leadership and ability to take responsibility for his

enrollment management decisions.  (Siminoe Dep. 8-9.)  The group discussed

what would occur on the day of Plaintiff's termination.  (Siminoe Dep. 13-14.)  It

was decided that Plaintiff would be escorted from the building after he was told

of his termination.  (Siminoe Dep. 19.)

While other management employees had been terminated during his

presidency at SCSU, Potter had never directed that anyone else be escorted upon

their termination.  (Potter Dep. 60-61.)  The group acknowledged the possibility

that escorting Plaintiff would create speculation and negatively affect public

perception of his termination.  (Potter Dep. 82-84.)  Potter, however, decided to

escort Plaintiff because Potter felt he was responsible for safeguarding SCSU's

assets, and it would be a failure in his role as President to not take the measure of

escorting Plaintiff.  (Potter Dep. 62-63.)

Potter provided Plaintiff 90 days' notice of Plaintiff's termination on

September 20, 2011.  (Potter Aff. ¶ 14, Ex. B.)  Plaintiff was given the termination

letter and escorted to his office and car by Siminoe.  (Saffari Aff. ¶ 39.)  He was

then observed until he drove off of the parking lot.  (<u>Id.</u>)  Plaintiff stated that this

entire process made him feel humiliated and ashamed.  (<u>Id.</u> ¶ 40.)

Witnesses observed Plaintiff being escorted out of the building.  (Siminoe

Dep. 15-17.)  There was also media coverage of the termination.  (Saffari Aff. ¶

41.)  Plaintiff points out that an article appeared in the <u>Spokesman Recorder</u>

expressing the sentiment that Plaintiff should have accepted resignation to

prevent from being treated like a criminal and escorted off campus; however,

Debra Leigh, SCSU professor and the author of that article, entitled "SCSU

Campus Has Shown a Commitment to Diversity," actually wrote the following:

> I do not agree that Dr. Saffari was treated like a common criminal.  When Dr. Saffari chose firing instead of resigning, he called into play a standard protocol that administrators are advised to follow, but there were no handcuffs, cops, and no campus security according to one observer.  Dr. Saffari's keys were taken and he was escorted to his car by a woman I consider my elder, and my age is over 55.

(Schermer Aff., Ex. 9.)

### xi.   Statements Made After Plaintiff's Termination

Potter made various statements about Plaintiff's termination.  He told

Leigh, who also served as the Lead Organizer for the Community Anti-Racism

Education Initiative, that Plaintiff was terminated because he did not create an

enrollment management plan.  (Leigh Dep. 4, 30.)  Potter expressed this same

reason to the Staff and Faculty of Color Caucus.  (Potter Dep. 77.)  Potter also told

Malhotra that Plaintiff never provided Potter a finished enrollment management

plan.  (Malhotra Dep. 27-28.)  At one point, Potter made the following statement:

"It is a matter of public record that we have never had an enrollment

management plan since I arrived at SCSU and before."  (Potter Dep. 101.)

However, Potter told Mark Jaede, Assistant Professor of History at SCSU, that

Plaintiff's termination was not a matter of performance.  (Potter Dep. 115-16.)

Finally, he characterized Plaintiff's termination as an attempt for the

administration to go in a new direction.  (Potter Dep. 80-81.)

When the student newspaper at SCSU asked Potter if escorting a person

out of the building was standard operating procedure, Potter stated that such an

occurrence was not atypical.  (Schermer Aff., Ex. 7 (student newspaper quoting

Potter as saying that escorting Saffari "was not unusual practice.").)  However,

Potter was unable to name a single person who had been escorted in such a way.

(Id. ("[Potter] could not, however, name any other cases in which a security

escort was used.").)  Later, when asked by the Community Anti-Racism

15

Education Initiative what the protocol for terminating management employees was, Potter did not respond, stating that he was not at liberty to talk about what had happened.  (Leigh Dep. 10-11.)  Siminoe, in her deposition, stated that the only other person who had been escorted off campus in such a way was an employee who had been accused of financial mismanagement.  (Siminoe Dep. 21-23.)

### xii.  Letter Providing Reasons for Termination

During the 90-day termination period, Plaintiff was given a special project to complete at home.  (Potter Aff. ¶ 14; Anderson Aff., Ex. 1, Saffari Dep., Ex. 43.)  Pursuant to Minn. Stat. § 181.933, Plaintiff requested the reasons for his termination, and Malhotra provided the following letter, dated October 31, 2011:

> As I explained to you in our meeting on September 20, 2011, and as articulated in more detail in my August 19, 2011, letter to the Enrollment Management Committee members . . . the University has determined it is necessary to reorganize existing structure to significantly improve its enrollment management process.  The position of Associate Vice President for Enrollment Management, as you know, is a position of trust.  It is a professional position permitting significant autonomy and self-direction and that requires working effectively with a broad constituency.  There has been a lack of continued confidence in your leadership and in your judgment in this role.

During my tenure as provost you have not produced a satisfactory strategic enrollment management plan, despite my continual counsel to you to focus on data analytics and statistical predictive models.  I further counseled you to research the best practices from other universities to provide a national and regional context to the enrollment strategy.   Given increasingly challenging budget realities, it is essential that the University have a research-based statistical/econometric model on which to base recruiting and retention efforts and plan for increased or decreased enrollments. While there have been enrollment gains in certain areas, the lack of data analytics and predictive capacity that should be part of such a plan have deprived the university of the tools needed to manage the allocation of resources and determine the most effective recruitment and retention strategies.   This has limited St. Cloud State University's ability to prepare for or weather changes in enrollment such as the recently reported lower enrollment for fall of 2011.

Finally, I will note that concerns regarding the lack of a satisfactory enrollment management plan have been raised with you numerous times during your employment, including by the President and the prior provost.

(Anderson Aff., Ex. 1, Saffari Dep., Ex. 44.)

### xiii.  SCSU's Enrollment Operations After Plaintiff's Termination

Defendants note that, since Plaintiff's termination, SCSU has developed

data analysis tools, which enabled it to predict the 2013-2014 academic year's

enrollment within less than one percentage point, resulting in more informed

budgetary choices.  (Potter Aff. ¶ 15; Potter Dep. 121, 126; Malhotra Dep. 21, 34.)

Plaintiff, however, points out that there is still no enrollment management plan

17

in one place or in one document; there is simply an unwritten strategic position

on enrollment scattered across various documents.  (Malhotra Dep. 21-23.)

Plaintiff also notes that there is an ongoing concern about the accuracy of SCSU's

public predictions on enrollment.  (Palmer Dep. 27.)

### B.  Procedural Background

On January 3, 2013, Plaintiff commenced this action against Defendants.

[Docket No. 1]  Plaintiff's Complaint alleges Count I: National Origin, Color, and

Religious Discrimination in Violation of Title VII of the Civil Rights Act of 1964

("Title VII") and the Minnesota Human Rights Act ("MHRA"); Count II: Civil

Rights Violations under 42 U.S.C. § 1983 ("Section 1983"); Count III: Violation of

the Minnesota Government Data Practices Act ("MGDPA"); and Count IV:

Defamation.  All counts are asserted against both Defendants.  Defendants have

moved for summary judgment on all claims.  [Docket No. 19]

## III.    DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of

Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty

Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### B.  Barred Claims

As an initial matter, certain claims in this action fail by operation of

various statutes.

### i.  Title VII Claims Against Potter

Plaintiff's Title VII claims against Potter in his official capacity and in his

individual capacity are barred because Title VII does not permit individual

supervisor liability.  <u>Roark v. City of Hazen, Ark.</u>, 189 F.3d 758, 761 (8th Cir.

1999) ("[A] supervisor may not be held liable under Title VII.").

### ii. Section 1983 Claims Against Potter in His Official Capacity and SCSU

Potter, in his official capacity, and SCSU are not subject to suit under 42 U.S.C. § 1983.  Section 1983 claims can be asserted against a "person" acting under color of state law who deprives another person of federal rights.  42 U.S.C. § 1983.  However, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("We hold that).  Therefore, the Section 1983 claim against Potter in his official capacity fails.  See id.

Furthermore, the Eighth Circuit has held that state universities are not persons within the meaning of the statute.  See, e.g., Prostrollo v. Univ. of S.D., 507 F.2d 775, 777 n.1 (8th Cir. 1974).  Accordingly, the Court concludes that Section 1983 does not apply to SCSU, and the claim against it must fail.

### C. Remaining Claims

The following claims remain: (1) the Title VII claim against SCSU, (2) the Section 1983 claim against Potter in his individual capacity, (3) the MHRA claim, (4) the MGDPA claim, and (5) the defamation claim.  The Court will first examine the federal claims.

20

## D. Federal Claims Against SCSU and Potter Individually

Under Title VII and Section 1983, Plaintiff alleges discrimination based on

national origin, color, and religion.  Plaintiff presents claims for (1)

discriminatory termination, (2) disparate treatment, (3) hostile work

environment, and (4) First Amendment violations.

### i.  Legal Standard for Discrimination Claims

To prevail on a Title VII discrimination claim, a plaintiff must show the

following four elements: "(1) he is a member of a protected class; (2) he met his

employer's legitimate expectations; (3) he suffered an adverse employment

action; and (4) the circumstances give rise to an inference of discrimination."  Pye

v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011).  The parties agree that

elements one and three are met here.

There are two ways to prove element four, discriminatory intent: either by

proffering direct evidence of intent or by meeting requirements under the

McDonnell Douglas burden shifting analysis.  Direct evidence in this context

includes evidence of statements or conduct by employment decision-makers

regarding an adverse employment decision, and these statements or conduct

must indicate a discriminatory attitude that would lead the finder-of-fact to infer

that the discriminatory attitude was a motivating factor in the adverse employment decision.  Cronquist v. City of Minneapolis, 237 F.3d 920, 925 (8th Cir. 2001).

If a plaintiff cannot show direct evidence of discriminatory intent, he may establish a prima facie case with circumstantial evidence under the McDonnell Douglas test.  Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998).  If a plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer evidence of legitimate, non-discriminatory reasons for its employment decision.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If a defendant offers a legitimate, non-discriminatory reason for its decision, the burden shifts back to the plaintiff to "demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext" for unlawful discrimination.  Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009). In doing so, and "[i]n order to survive summary judgment at this stage, the plaintiff must establish there is a factual dispute whether the defendant's proffered reason is pretextual and whether retaliation was a determinative factor

in the defendant's termination." <u>Macias Soto v. Core-Mark Int'l, Inc.</u>, 521 F.3d

837, 841 (8th Cir. 2008).

### ii. Title VII and Section 1983 Discriminatory Termination Claims Against SCSU

Plaintiff's discriminatory termination claims fail as a matter of law because

Defendants have produced evidence of their legitimate, non-discriminatory

reasons for terminating Plaintiff, and Plaintiff has failed to show that these

reasons are pretext.


<u>Prima Facie Case for Discrimination:</u>

Plaintiff maintains that he has made a prima facie case of discrimination

here.  First, he asserts that he did indeed meet SCSU's expectations, especially

with regard to the enrollment management plan, because the Enrollment

Management Committee predicted the enrollment decline that occurred in the

fall of 2011.  Plaintiff also asserts that he met SCSU's expectations because

Malhotra never gave Plaintiff any performance evaluations in the two years he

was Provost, and there is nothing in Plaintiff's personnel file stating that he

performed poorly.

Plaintiff, pointing to circumstantial evidence of totality of circumstances, asserts that there was an inference of discrimination in his termination.  Plaintiff alleges that one may reasonably infer discrimination in his termination from the tense conversations regarding Iranian politics, comments about his religion, and the fact that he met employment expectations.  However, because Plaintiff cannot show discriminatory conduct or statements that were related to his termination, Plaintiff's evidence is circumstantial and analysis within the burden shifting framework is required.  To demonstrate discrimination with circumstantial evidence, Plaintiff must show that he met SCSU's legitimate expectations of the position, and he must show that the circumstances gave rise to an inference of discrimination.  Pye, 641 F.3d at 1019.  Assuming but not deciding that Plaintiff's circumstantial evidence establishes a prima facie case for discrimination, the claim ultimately fails because Defendants provide legitimate reasons for terminating Plaintiff, and Plaintiff is unable to demonstrate that these reasons are pretext.

Legitimate, Non-Discriminatory Reasons for Termination:

24

Defendants have offered three non-discriminatory reasons for terminating

Plaintiff's employment.  First, Defendants argue that Potter and SCSU

terminated Plaintiff because he failed to provide a satisfactory enrollment

management plan.  Defendants point out that the plan that Plaintiff did develop

was not satisfactory because it lacked support from data analytics or statistical

modeling; Plaintiff did not create a quantitative analysis of the demographic

changes that could be encountered by SCSU.  Specifically, as early as 2007, Potter

himself rejected Plaintiff's enrollment management plan as unsatisfactory and

asked him to create a new plan with a better predictive model.  (Potter Dep. 48-

49, 77.)  After the Enrollment Management Committee created what it thought

was a predictive model, Malhotra told the Committee and Plaintiff that it was

unsatisfactory.  (Palmer Dep. 7, 9-11.)  SCSU was also increasingly frustrated

with Plaintiff's inadequate predictive model.  (Palmer Dep. 25-27; Potter Dep. 41-

42, 44, 72, 124-25.)

Second, Defendants argue that they terminated Plaintiff because his faulty

plan did not adequately prepare SCSU for a significant budget shortfall.  The

Committee's forecasts for entering freshmen were so inaccurate that they

25

predicted an enrollment shortfall that was off by several hundred of students—regardless of whether Malhotra adjusted of the projection. While Plaintiff insists that his plan predicted the enrollment decline, Defendants were surprised by the extent and magnitude of the decline, for which Plaintiff's plan did not prepare them. (Schermer Aff., Ex. 10; Palmer Dep. 21-22.) Plaintiff offers no evidence to directly rebut this.

Finally, Defendants argue that the third non-discriminatory reason for Plaintiff's termination was Plaintiff's breach of Potter's trust and failure to accept accountability for the budget shortfall. The record has provided ample evidence that Plaintiff had not met the reasonable expectations of his employer.

Pretext Arguments:

Because Defendants have proffered non-discriminatory reasons for terminating Plaintiff, Plaintiff is required to show that these reasons are mere pretext. Viewing the evidence in the light most favorable to Plaintiff, there is insufficient evidence from which a reasonable factfinder could find pretext.

A plaintiff can demonstrate pretext by showing that the employer's proffered reasons are unworthy of belief.  <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981).  First, Plaintiff notes that Defendants were in fact satisfied with Plaintiff's enrollment management plan.  Plaintiff concludes that satisfaction is implied here because he was never told that Defendants were dissatisfied with his plan.  Plaintiff notes that this is especially true considering he never received a performance evaluation.  This argument, however, ignores evidence in the record that Plaintiff was notified that the plan was unsatisfactory.  (<u>See, e.g.</u>, Potter Dep. 48-49, 77; Palmer Dep. 7, 9-11 (indicating that Potter rejected Plaintiff's plan and Malhotra rejected the Committee's plan, and each requested a more reliable predictive model).)  These instances of communicated dissatisfaction indicate that Defendants consistently demonstrated dissatisfaction with Plaintiff's performance.  Furthermore, Plaintiff's suggestion that an absence of performance evaluations does not adequately demonstrate that the proffered reasons for terminating Plaintiff are unworthy of belief.

Second, Plaintiff argues that Defendants' focus on a supposed desire for data analytics is disingenuous because the difference between data

analytics and the approach Plaintiff used in formulating his enrollment

management plan is irrelevant, and Plaintiff's approach was sufficiently

thorough.  While this argument may present a reasonable basis for

disagreement with Defendants' preferences regarding enrollment plans, it

does not show that Defendants' reasons for terminating Plaintiff were

disingenuous and unworthy of credence because Defendants' desire for a

plan using data analytics was similarly reasonable.  If anything, this

argument only highlights the professional disagreement between the

parties regarding the proper standards for creating enrollment plans.

Beyond this, without further indicia of discrimination, the Court cannot

decide what constitutes a satisfactory enrollment management plan, as

doing so would be second-guessing the wisdom of Defendants'

termination decision, which is impermissible.  See Kiel v. Select Artificials,

Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) ("[E]mployment-discrimination

laws have not vested in the courts the authority to sit as super-personnel

departments reviewing the wisdom or fairness of the business judgments

made by employers, except to the extent that those judgments involve

intentional discrimination.") (citation omitted).

Plaintiff also argues that Defendants' proffered rationale for terminating

Plaintiff because he did not prepare SCSU for the decline in freshman enrollment

is pretext because SCSU did in fact expect an enrollment decline.  However,

Defendants have asserted that a decline was expected, but Plaintiff's failure was

that his predictive model did not prepare the University for the magnitude of the

decline.  (See Potter Aff. ¶ 11 ("I did not blame Saffari for the fact that there was a

decline in enrollment.  However, I believed that the decline was something that

could have been accurately predicted had Saffari employed the data analytical

tools . . . ."); Schermer Aff., Ex. 10 (letter from Malhotra to Potter) ("I was bracing

for a decline but not of this magnitude."); Palmer Dep. 21-22 ("The members of

the subcommittee . . . were not surprised by a decline, we were surprised by the

magnitude of the decline.").)  Plaintiff offers no support to directly rebut this.

Finally, Plaintiff argues that Defendants' proffered reasons are pretext

because Potter shifted explanations for the termination.  An employer's shifting

rationale for termination can be evidence that its rationale is pretextual.  See

<u>Maschka v. Genuine Parts Co.</u>, 122 F.3d 566, 570 (8th Cir. 1997) (holding that evidence of an earlier, inconsistent termination rationale was relevant at trial because it tends to show that the offered reason is pretext).  Plaintiff argues that Potter offered shifting explanations about Plaintiff's termination: at various times, he said that termination was because Saffari did not produce an enrollment management plan; was <u>not</u> because of performance; and was because he failed to produce a predictive model.

Considered in context, this argument fails, however.  Viewing the evidence in the light most favorable to Plaintiff, Potter's explanations are not accurately described as shifting or inconsistent rationale to warrant application of <u>Maschka</u> because the reasons listed are fairly consistent.  <u>Maschka</u> involved two directly contradictory termination rationales: one letter explaining why the plaintiff had been terminated admitted against the defendant's trial explanation for terminating the plaintiff presented at trial.  <u>Id.</u> at 569-70.  Circumstances in the present case are markedly different.  Here, on three separate occasions, Potter told two different organizations and Malhotra that Plaintiff was terminated because he did not create an enrollment management plan.  (Leigh Dep. 4, 30;

Potter Dep. 77, 101; Malhotra Dep. 27-28.)  This explanation is consistent with

what Defendants now proffer as their termination rationale.  However, Potter

stated in his deposition that, on one occasion, he told Mark Jaede, Assistant

Professor of History at SCSU, that Plaintiff's termination "was not for

performance and [SCSU] had determined to go in a different direction."  (Potter

Dep. 115-16.)  Potter explained that he was attempting to protect Plaintiff's

reputation and curtail discussion among staff that could foster rumors that

Plaintiff had committed dishonesty or malfeasance:

> [W]e agreed that we were not going to discuss Dr. Saffari's
> performance with the staff.  And particularly wanted to
> communicate that this was not a disciplinary action.  It was not a –it
> didn't occur as a consequence of some malfeasance or dishonesty.
> And so we characterized it as not a matter of performance, but an
> interest in the university's part of changing both direction and the
> way in which we managed enrollment.

(Id. 80-81.)  Viewing the record as a whole, there is not enough evidence from

which a reasonable juror could conclude that Potter's statements show pretext.

Additionally, the Court concludes that Defendants receive the benefit of

the "same actor" inference regarding Plaintiff's termination claim.  There is "a

strong inference that discrimination was not a motivating factor if the same

person hired and fired the plaintiff within a relatively short period of time."  Herr

v. Airborne Freight Corp., 130 F.3d 359, 362-63 (8th Cir. 1997).  "This inference

arises because it is unlikely that the same supervisor would hire a [person of a

protected class], only to turn around and discharge [him] for that reason." Id. at

363.  Here, because Potter previously advocated on Plaintiff's behalf and decided

not to terminate him, there is an inference that Potter lacked discriminatory

intent when Plaintiff was later terminated.  Plaintiff fails to effectively rebut this

"same actor" consideration.

Viewing the evidence in the light most favorable to Plaintiff, the Court

concludes that Defendants have offered legitimate reasons for terminating

Plaintiff, and Plaintiff's attempts at showing pretext are inadequate.

Accordingly, the Court dismisses the discriminatory termination claim.

### iii.  Title VII and Section 1983 Disparate Treatment Claim Against SCSU and Potter

Plaintiff also makes a claim for disparate treatment.  (Compl. ¶ 20.)  The

parties argue this claim within the McDonnell Douglas burden shifting

framework.  Viewing the evidence in the light most favorable to Plaintiff, the

Court concludes that the disparate treatment claim fails because Plaintiff has not

offered sufficient evidence to show pretext.

Prima Facie Case for Discrimination:

Specifically, Plaintiff argues that there is circumstantial evidence for

disparate treatment discrimination because Plaintiff was escorted from his office

to the parking lot when he was terminated.  Plaintiff also asserts that he was

treated differently by being told that he could not speak to employees in his

department, while other non-Iranian terminated employees were not told this.

Assuming without deciding that these points comprise a prima facie case for

disparate treatment, the claim ultimately fails because Defendants provide

legitimate reasons for escorting Plaintiff, and Plaintiff is unable to demonstrate

that these reasons are pretext.


Legitimate, Non-Discriminatory Reasons for the Manner of Termination:

Defendants provide a legitimate, non-discriminatory reason for the

decision to escort Plaintiff off campus.  They argue that the decision to escort

Plaintiff was based on a desire to safeguard SCSU's private and sensitive

information and equipment.  Defendants also claim that Plaintiff was escorted in

order to allow the administration the ability to inform staff about the change in

leadership in the appropriate way.  Defendants also note that Plaintiff was not

told to not talk to his staff; rather, he was told in his termination letter that he did

"not need to contact others in your former office" because his special project did

not involve past duties.  (Second Anderson Aff., Ex. 6, Malhotra Dep., Ex. 2.)

Defendants argue that this instruction was not discriminatory.


Pretext:

      A plaintiff may show pretext in disparate treatment claims by showing

that he was treated differently from others who were similarly situated.  See

Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691-92 (8th Cir. 2002).  Similarly

situated others, however, must be similarly situated in all relevant respects.  Id.

(holding that two comparators were not similarly situated where the plaintiff did

not show that two employees had a comparable disciplinary history).  This is a

rigorous and difficult test, as "employees used for comparison must have dealt

with the same supervisor, have been subject to the same standards, and engaged

in the same conduct without any mitigating or distinguishing circumstances."

Muor v. U.S. Bank Nat'l Assoc., 716 F.3d 1072, 1078 (8th Cir. 2013) (internal

quotation marks omitted).

Plaintiff has failed to show pretext here because he is unable to show that

others not escorted were similarly situated in all relevant respects.  Plaintiff

argues that he was the only terminated administrator who was escorted off

campus.  However, a review of the record shows relevant distinctions in the

circumstances of other administrators who were not escorted that show they are

not truly similarly situated.  For example, another administrator was terminated

off campus and therefore did not need to be escorted from campus.  (Siminoe

Dep. 21.)  Other administrators who were not escorted did not have access to

their offices anyway, so there was no need to escort them to safeguard sensitive

information.  (Malhotra Dep. 69-70.)  Finally, yet another administrator who was

not escorted was told to work from home and not come to campus.  (Potter Dep.

58-59.)  Notably, she was told not to contact her staff, which further weakens

Plaintiff's claim that he was the only administrator told not to contact his staff.

(Id.)

Finally, it is significant that none of the other administrators have been shown to have breached Potter's trust as Potter thought Plaintiff had. These distinctions are relevant, and they make Plaintiff's disparate treatment claim untenable. He is unable to demonstrate that similarly situated administrators were treated differently. Viewing the record as a whole, the Court concludes that the evidence is insufficient for a reasonable factfinder to find pretext. Accordingly, the Court dismisses Plaintiff's disparate treatment claim.

### iv. Both Title VII and Section 1983 Harassment (Hostile Work Environment) Claims Against SCSU and Potter

Plaintiff's complaint asserts that Defendants violated Title VII and Section 1983 by subjecting him to harassment resulting from hostile work environment. Plaintiff alleges hostile work environment under Title VII against Potter, individually, and alleges harassment in violation of Section 1983 and the Equal Protection Clause of the Fourteenth Amendment against SCSU.

To establish a harassment claim, a plaintiff must show that: (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on his protected class status; (4) the harassment affected the terms, conditions, or privileges of his employment; and (5) the employer

knew or should have known of the harassment and failed to take appropriate

remedial action.  See, e.g., Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216,

1222 (8th Cir. 1997).  To show hostile work environment, a plaintiff must indicate

that his work environment was severely and continually pervaded with

intimidation, ridicule, and insult based on protected class status, so much so that

the plaintiff's conditions of employment were altered and an abusive work

environment was created.  See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,

66-67 (1986); Quick v.  Donaldson Co., Inc., 90 F.3d 1372, 1379 (8th Cir. 2006).

Plaintiff's allegations simply fail to rise to the level of harassment or hostile

work environment.  The conduct creating hostile work environment harassment

must be "extreme in nature and not merely rude or unpleasant."  Sutherland v.

Mo. Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009) (citation omitted).

"[O]ffhand comments and isolated incidents (unless extremely serious) will not

amount to" an actionable claim for harassment.  Faragher v. City of Boca Raton,

524 U.S. 775, 788 (1998).

The strongest facts supporting Plaintiff's claim are (1) that someone

referred to plaintiff as "that Arab guy," (2) that Plaintiff and Potter had an

uncomfortable conversation about his and Spitzer's religious beliefs, and (3) that

Plaintiff and Potter engaged in conversation about Iranian politics, which made

Plaintiff uncomfortable.  However, this limited number of potentially offensive

comments is not enough.  See, e.g., Elmahdi v. Marriott Hotel Servs., 339 F.3d

645, 653 (8th Cir. 2003) (holding that racially offensive statements that occurred

on "a few occasions over a period of years" were insufficient to create a hostile

work environment).

Potter's comments are more aptly categorized as isolated incidents and

they are not suggestive of a connection to Plaintiff's termination in the totality of

the circumstances.  Even if the conversation between Potter and Plaintiff was

discriminatory, Plaintiff has failed to show any connection between the

conversation and Plaintiff's termination.  Cronquist, 237 F.3d at 925 ("Not all

comments that may reflect a discriminatory attitude are sufficiently related to the

adverse employment action in question to support [an inference of

discrimination].")  Given that the conversation occurred in 2008, the year before

Potter's decision to retain Plaintiff and three years before Plaintiff's termination,

it is unlikely that the conversation and Plaintiff's termination are sufficiently

related to rise to the level of harassment.  For these reasons, the Court concludes that Plaintiff's hostile work environment claim against Potter, and harassment claim against SCSU, fails.

### v.  Section 1983 First Amendment Claim Against Potter, Individually

Plaintiff asserts a Section 1983 claim against Potter regarding Plaintiff's First Amendment rights.  Specifically, Plaintiff claims that he was retaliated against for his speech and that his speech was restrained.  For the following reasons, the Court concludes that Plaintiff's First Amendment claim fails.

To prevail on a Section 1983 action, a plaintiff must prove two elements: (1) the action complained of was committed by a person acting under color of state law, and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States.  Dubose v. Kelly, 187 F.3d 999, 1002 (8th Cir. 1999).

First, regarding retaliation for speech, Plaintiff argues that both elements are met.  Plaintiff claims that his termination was retaliation for the speech he made at the August 1, 2011 leadership retreat about focus group selection and SCSU's reputation for being a party school, after which Potter became visibly

angry.  Plaintiff argues that this speech about enrollment issues at SCSU was

protected because it was a matter of public concern; enrollment was of great

interest to both members of the community and the faculty.

Second, in asserting his First Amendment claim, Plaintiff also claims that

his speech was unconstitutionally restrained.  Specifically, Plaintiff cites when

Malhotra prevented him from accepting the invitation to speak to the Faculty

Senate about enrollment issues.  (Compl. ¶ 11.)  Plaintiff argues that the

statements he would have made were protected because they were not job-

related, as it was not a responsibility of Plaintiff's job to address the Faculty

Senate.  Plaintiff maintains that the purpose of his speech was not to address a

private employment interest, but to raise issues of public concern.  Therefore, this

was protected speech and was unconstitutionally restrained.

The Court holds that neither Plaintiff's comments made at the retreat nor

what he would have said at the Faculty Senate were constitutionally protected

speech because they did not involve a matter of public concern.  A matter of

public concern involves political, social, or other concerns of the community.  See

Connick v. Myers, 461 U.S. 138, 146 (1983) (holding that speech on a matter of

public concern is protected).  In determining whether speech evokes a matter of public concern, one must examine the speech's content, form, and context.  Id. at 147-48.  Statements are not a matter of public concern if they are purely job-related.  Buazard v. Meridith, 172 F.3d 546, 548 (8th Cir. 1999).

"[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."  Garcetti v. Ceballos, 547 U.S. 410, 424 (2006).  Furthermore, "speech by public employees undertaken in the course of their job duties will frequently involve matters of vital concern to the public, without giving those employees a First Amendment right to dictate to the state how they will do their jobs."  See Urofsky v. Gilmore, 216 F.3d 401, 407 (4th Cir. 2000).

Here, Plaintiff's comments at the retreat and what he would have said at the Faculty Senate were not a matter of public interest.  Plaintiff did not seek to communicate some wrong to the public in these contexts.  These instances of speech were purely job-related, and the tone of the speeches was not to "bring to light actual or potential wrongdoing or breach of public trust on the part of" SCSU.  See Connick, 461 U.S. at 148.  The statements were made in Plaintiff's role

41

as Associate Vice President for Enrollment Management, and Plaintiff

acknowledged his statements were job-related in stating that he raised the

enrollment issues "as the chief enrollment officer." (Saffari Dep. 86.) In these

instances, Plaintiff was merely reporting or given the opportunity to report on

his work to others in the context of his employment. Furthermore, in considering

the context of the speech, the retreat and the Faculty Senate meeting were

relatively non-public venues involving only faculty, not a larger community of

interested listeners. Because Plaintiff's comments in these instances were not a

matter of public interest, Plaintiff had no First Amendment interest in his speech.

However, in continuing to allege restraint on speech, Plaintiff also points

to the September 2011 Strategic Planning Committee meeting. Plaintiff claims

that, during the meeting, Foss cut Plaintiff off and did not allow him to speak

after he complained that Foss discriminated against people of color. Arguably,

Plaintiff's statements to Foss about her treatment of faculty of color raise a matter

of public interest because they allege discrimination. Crain v. Bd. of Police

Comm'rs, 920 F.2d 1402, 1411 (8th Cir. 1991) (holding that a written complaint

alleging racial discrimination by a supervisor involved a matter of public

concern).  However, Plaintiff's conversation with Foss is irrelevant to the claim

against Potter because Section 1983 does not allow for vicarious liability.

Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is

inapplicable to . . . § 1983 suits, [a plaintiff] must plead that each Government-

official defendant, through his own individual actions, has violated the

Constitution.").

Therefore, the only relevant aspect of this conversation is Potter's intent

and knowledge of this conversation.  Potter was not present at this meeting and

was unaware that these comments were made.  (Second Potter Aff., Docket No.

37, ¶ 2; Potter Dep. 68-71; Foss Dep. 57-62, 70-73.)  Because of this, Plaintiff has

no actionable claim against Potter for Foss's actions.  Accordingly, the Court

dismisses Plaintiff's First Amendment claim altogether.

### E.  Plaintiff's State Law Claims

Plaintiff asserts MHRA, MGDPA, and defamation claims against SCSU

and Potter.  However, these state law claims fail against SCSU and Potter in his

official capacity on Eleventh Amendment grounds.  The Eleventh Amendment

prohibits federal courts from exercising jurisdiction over state law claims against

non-consenting states when the state is the real, substantial party in interest.

Cooper v. St. Cloud State Univ., 226 F.3d 964, 968-69 (8th Cir. 2000) (holding

SCSU immune from MHRA claims under the Eleventh Amendment).  In other

words, claims that a state agency has violated state law are barred from federal

court, even if those claims are pendent to federal claims.  Id. (citing Pennhurst

State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984)).

Plaintiff's state law claims against SCSU and Potter in his official capacity

are barred under the Eleventh Amendment.  Furthermore, the MHRA and

MGDPA claims against Potter in his individual capacity fail because neither

statute provides for individual liability.  The MHRA does not impose individual

liability for discrimination on supervisors.  Arens v. O'Reilly Automotive, Inc.,

874 F. Supp. 2d 805, 807-08 (D. Minn. 2012).  Additionally, "the [MGDPA] does

not impose civil liability on individuals."  Walker v. Scott County, 518 N.W.2d

76, 78 (Minn. Ct. App. 1994), rev. denied (Aug. 24, 1994).  Therefore, Potter

cannot be individually liable under either statute.  Plaintiff does not contest these

conclusions with respect to the MHRA claim, and Plaintiff concedes that the

MGDPA claim fails.  (Pl.'s Mem. 1, n.1.)

Accordingly, the Court dismisses Plaintiff's MHRA and MGDPA claims.

### F.  Defamation Claim

This leaves the defamation claim.  Because the Court has dismissed all federal claims, it is purely within the Court's discretion whether to retain supplemental jurisdiction under 28 U.S.C. § 1367 and decide the defamation claim.  Carlsbad Tech. Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").  Because Plaintiff has spent a significant amount of time on this claim and only questions of law remain, the Court will retain jurisdiction over the claim.  See Condor Corp. v. City of St. Paul, 912 F.2d 215, 221 (8th Cir. 1990) (listing time spent in litigation as a factor in deciding to reach the merits of a pendent state claim).  Nevertheless, the Court holds that the defamation claim fails on the merits.

Statements are considered defamatory if they are (1) false; (2) communicated to someone other than the plaintiff; and (3) tend to harm the

plaintiff's reputation and to lower his estimation in the community.  <u>Lewis v.</u>

<u>Equitable Life Assur. Soc.</u>, 389 N.W.2d 876, 886 (Minn. 1986).

Plaintiff provides various factual bases for his defamation claim.  First,

Plaintiff alleges that he was defamed when "[t]hey made statements that he was

escorted and they made statements that he was instructed not to talk."  (Pl.'s

Mem. 30-31.)  A defamation claim based on these statements fails as a matter of

law.  These statements are impermissibly vague, as Plaintiff has not pled the

statements with reference to "who made the statement, to whom it was made,

and where."  <u>Burns v. City of Minneapolis</u>, 2001 WL 1589619, at *3 (D. Minn.

2001).  There is no indication that Potter made these alleged statements and no

allegations as to when or where these statements were made.  Additionally, these

statements are not false, and therefore Plaintiff fails to show all elements of a

defamation claim.

Second, Plaintiff, claiming defamation by implication, argues that he was

defamed when SCSU administrators failed to explain why he was escorted off

campus, and this omission created the implication that Plaintiff had committed

malfeasance.  <u>Diesen v. Hessburg</u>, 455 N.W.2d 446, 450 (Minn. 1990) (assessing a

claim for defamation by implication when a series of articles written about the

plaintiff implied a false notion).  Plaintiff argues that this omission was

particularly egregious because Potter expected there would be speculation

surrounding Plaintiff being escorted off campus, especially because Potter had

never directed any other administrator to be escorted off campus.

This second claim also fails as a matter of law.  First, the conduct of

escorting Plaintiff after his termination is not defamatory in itself.  See Bolton v.

Dept. of Human Servs., 540 N.W.2d 523, 526 (Minn. 1995) (holding that the

conduct of escorting terminated employees is not actionable defamation by

conduct).  Therefore, the Court is left to consider any implication created by

statements Potter made after Plaintiff's termination.  The student newspaper

quoting Potter only provides that Potter said escorting was routine practice in

the education industry.  (Schermer Aff., Ex. 7 ("Potter said that this was not

unusual practice. . . . 'Yes, there have been other people [escorted off campus]

since I've been here.'").)  Plaintiff has not shown this to be false, but he asserts

Potter's failure to explain why Plaintiff was escorted is what created a

defamatory implication.  Potter's refusal to answer a question expressly

attributed his omission to legal limitations; it was not an omission suggestive of wrongdoing by Plaintiff.  Even though the student newspaper implied suspicion as to Potter's inability to name others who had been escorted it in such a way, the newspaper is the entity that created any negative implication, not Potter.  (<u>Id.</u> ("When asked to name the positions in which this action was taken, Potter said he could not, under the law.").)  As in <u>Diesen</u>, the newspaper would be the proper party to whom one would attribute a defamatory omission, because the newspaper is responsible for the "thrust and tenor of the article[]" and its "organizing and editing."  <u>Diesen</u>, 455 N.W.2d at 450.

Furthermore, Plaintiff has not shown that any implication tended to harm Plaintiff; rather, Potter's statements likely helped Plaintiff by suggesting that he was treated no differently from other terminated employees.  Stating that escorting is standard procedure relieves Plaintiff from scrutiny and reduces speculation that he committed wrongdoing to warrant unique, negative treatment.  Considering the record as a whole, there is insufficient evidence for a reasonable factfinder to conclude that (1) Potter's statements were false or (2)

Potter's statements and omissions implied something that harmed Plaintiff's reputation.  The Court therefore dismisses Plaintiff's defamation claim.

Finding no genuine dispute of material fact, and viewing the record in the light most favorable to Plaintiff, the Court concludes that there is insufficient evidence by which a reasonable juror could find for Plaintiff on any claim. Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants St. Cloud State University and President Earl H. Potter III's Motion for Summary Judgment [Docket No. 19] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   August 12, 2014                          s/ Michael J. Davis
                                                          Michael J. Davis
                                                          Chief Judge
                                                          United States District Court